## D. I. JARRETT, Admr.

### *v.*

## WILLIAM M. JOHNSON *et al.*

*Opinion filed June 23, 1905.*

1. ACCOUNTING—*when an objection to item of compensation for services is sufficiently raised.* Under a rule of the master in chancery requiring complainants in a bill against a trustee for accounting to file written objections to such parts of the trustee's account as they desired to contest, a written objection to the allowance of any compensation to the trustee on the ground of alleged improper conduct sufficiently presents an objection to an item for services rendered.

2. TRUSTS—*when original agreement for compensation of trustee does not control.* A court of equity, on bill for accounting against a trustee, may allow reasonable compensation in addition to the compensation fixed in the agreement creating the trust, where a subsequent express agreement was made requiring him to render additional services different in character from those called for in the original agreement.

3. SAME—*when trustee must account for profits from stock held by him.* A trustee appointed to conduct a manufacturing business for creditors, who, by sole reason of his being engaged in that business, is enabled to purchase stock in a company formed to advance the cause of that business, must account to creditors for the profits derived from the stock so purchased by him.

4. EXECUTORS AND ADMINISTRATORS—*when a claim is properly classified as of the sixth class.* A claim allowed against the estate of a trustee for moneys received under an express trust for the use of the beneficiaries of the trust is properly classified as of class 6.

APPEAL from the Branch Appellate Court for the First District;—heard in that court on appeal from the Superior Court of Cook county; the Hon. R. S. TUTHILL, Judge, presiding.

The following statement of facts in this case is made by the Appellate Court:

"Appellee Johnson filed his bill of complaint against Peter F. Kaehler, in his lifetime, for an accounting. The bill of complaint alleges that John Mayer and Lewis R. Towle, doing business as Mayer & Towle, operating a brick yard, became indebted to Peter F. Kaehler, now deceased, and other persons; that Kaehler commenced an attachment suit and levied on the personal property of Mayer & Towle; that subsequently an agreement was made whereby Kaehler agreed to dismiss the attachment suit, and a bill of sale was made conveying the personal property of the said firm to Kaehler, as trustee; that this bill of sale was accompanied by an additional agreement, wherein it was agreed that after the indebtedness to Kaehler shall be fully paid and satisfied, including his reasonable costs, expenses, and compensation for his services at the rate of $10 a week, he will thereafter hold and sell said property, as trustee, for parties named, and the proceeds of the sale of the property shall thereafter be paid to appellee Johnson, representing other creditors; that Kaehler is not to be charged with any rent for the real estate; that no personal liability is to be incurred by him; that attached to the agreement is a list of claims against Mayer & Towle, amounting to $8315.75. It is further alleged that Kaehler entered into possession of the real estate and personal property, and that, as no advantageous sale of the property could be made, it was proposed that he engage in the manufacture of brick, applying the proceeds in the same way as by the agreement the proceeds of the sale of the property were to be applied. It is charged that Kaehler proceeded to and did manufacture two millions of brick, which

he sold at a profit; that he rendered an account subsequently, showing that he had run the business at a loss. It is alleged in the bill that he charged excessively for feed; that he failed to discharge his trust, and an application was made for the appointment of a receiver.

"The answer of defendant admitted the execution of the agreement mentioned in the bill of complaint. He states that he engaged in the manufacture and sale of brick at the request of the complainants; that it was agreed he should furnish the necessary capital and should receive a reasonable compensation for his services and for the use of his capital, and that he was required to lay out a large sum of money in equipping the plant and repairing the machinery. He states that the business was run at a loss of $1850. He admits that he disposed of certain of the property and states what he received for it, and that he rendered a just and true account, when requested, before the filing of the bill herein. He denies that he has charged unreasonably for his services, and further denies that he made any charges in excess of his actual expenditures. He further states that no part of the original indebtedness to him has been paid.

"Upon the hearing the court entered a decree finding, among other things, that before any of the personal property, other than the brick on hand at the time Kaehler took possession of the premises, had been sold, Kaehler, with the knowledge and consent of the respective parties, began the manufacture of brick, it being understood that the net proceeds of such manufacture and sale were to be applied and divided in accordance with the original agreement above referred to; that in November, 1897, while Kaehler was in possession of the brick yard and personal property, a corporation known as the Cook County Brick Company was formed to promote the financial interests of brick manufacturers; that Kaehler became a member, subscribing for nine shares of stock, paying therefor the sum of $225 out of his own money; that he executed a lease to the Cook County Brick Company

of the premises occupied by him under the bill of sale and agreement referred to, at a rental of one dollar per annum, taking back from the brick company a lease of the same at a rental to be computed at the rate of $1.50 per thousand for brick manufactured on the premises. The decree finds that the Cook County Brick Company earned large profits, and paid Kaehler, as dividends upon his shares, the sum of $1012.50, and that afterwards said brick company attempted to cancel the membership of Kaehler, who sued the company to compel the payment of the balance of the dividend earned on his stock, and as a result of the litigation said brick company paid Kaehler $6000. The decree further finds that prior to the filing of the bill of complaint, upon the demand of appellee Johnson, Kaehler rendered an account showing the receipts and disbursements in connection with the brick yard, containing, however, no mention of the dividends received from the brick company, but charging $30 per week for his services and the use of his capital in operating the brick yard; that Kaehler received the property described in the bills of sale as trustee, for the purpose of paying his own claim and that of the other complainants, as provided by the terms of said agreement; that all moneys and profits received by him from the use and sale of said property, including the money received from the brick company, were likewise received by him in trust, for the uses and purposes specified in the same agreement; that Kaehler was indebted to appellee in the sum of $2572.85; that pending the suit Kaehler had died intestate, and the administrator of his estate was ordered to pay to complainants or their solicitor the sum found to be due from said estate, as above mentioned, in due course of administration, as a claim of the sixth class."

From this decree the administrator appealed to the Appellate Court for the First District, where, after finding the appellant's intestate was entitled to a further credit of $610, being $10 per week for the services under the original agree-

ment, and ordering such amount to be deducted from the amount found due from Kaehler's estate, the decree was in all other respects affirmed. This is an appeal from such judgment of affirmance.

DENIS E. SULLIVAN, for appellant.

JOSEPH H. FITCH, and WILLIAM M. JOHNSON, for appellees.

Mr. JUSTICE BOGGS delivered the opinion of the court:

To quote from the brief of counsel for appellant: "The appellant in this court only desires to argue four questions: *First,* Kaehler was charged with the full trading value of the machinery disposed of by him, namely, $1400, this amount being made up of three items, one note for $500 and one for $400, secured by trust deed on the property at Steger, Illinois, which trust deed Kaehler foreclosed and acquired title to the lots. He also received four lots which were conveyed to him by warranty deed, and was charged therefor $500, which was the consideration named in the deed. Appellees were entitled to receive either the value of the machinery traded, or securities and property received therefor, or the value of the security and property. They elected to take the value of the securities and property received by Kaehler but failed to make any proof as to what the actual value was. *Second,* the appellees were ruled by the master to file written objections to the account of Kaehler, which they did, and the evidence before the master was confined to those items to which objection was made. A charge of $610 by Kaehler for compensation was disallowed, although no objection was filed thereto. *Third,* it was error to charge Kaehler with the proceeds received from his stock in the Cook County Brick Company, it being his individual undertaking. *Fourth,* the chancellor erred in decreeing that the amount due appellees should be allowed as a sixth-class claim against the estate of Peter F. Kaehler, deceased."

*First*—It was not error that the full trading value of the machinery, namely, $1400, was charged against Kaehler, and that the appellees were credited with the value of the securities and property received by Kaehler. It was shown that Kaehler received two notes, one for $500 and one for $400, both secured by a trust deed on real estate at Steger, Illinois, and he also received four lots which were conveyed by warranty deed, and the consideration recited in the deed was $500. It was further shown that the trust deed securing the two notes was afterwards foreclosed and the title acquired by Kaehler. Moreover, when testifying as a witness Kaehler stated that the whole value of the property he received was $1400, and in a supplemental statement, bringing the account down to August 25, 1899, Kaehler charged himself with the amount realized from the sale of the machinery and fixed the sum at $1400.

*Second*—It is insisted that the appellees were required by a rule of the master in chancery to file written objections to such parts of the account as they desired to object to, which they did, and that the evidence before the master was confined to the items objected to; that a charge of $610 was made by Kaehler for services rendered, and that the master disallowed said sum of $610 without any written objection being filed thereto. Appellees filed an objection to Kaehler's account as to the allowance of any and all compensation, and urged that because of certain alleged improper acts on the part of Kaehler as trustee he had forfeited his right to any compensation whatever. From an examination of the proof preserved in the record on the point we think the objection sufficiently raised the question and that it was regarded by all the parties and by the master as being so raised, and that evidence was heard upon the question of this particular item in the account.

We may very properly here consider the cross-error assigned by appellees: "First, that in no event can more than the stipulated $10 per week be allowed for the trustee's com-

pensation; and second, that this trustee forfeited all claim to compensation in any amount because of his persistent refusal to account for the brick company money and his evident attempt to consume the whole fund by unjustifiable charges." Under the original agreement Kaehler was to hold the property for all the creditors of Mayer & Towle and should sell the same and make disposition of the funds derived therefrom in accordance with the understanding of the parties, for which said Kaehler was to receive compensation at the rate of $10 per week. Some weeks after this agreement was entered into, and after Kaehler had taken possession of the property, a further understanding was had among the parties to the original agreement, whereby, as no advantageous sale could then be made, Kaehler was to operate the brick plant for the use of all the parties, and that such capital as was necessary to operate the plant should be furnished by Kaehler. Under this later agreement to operate the brick plant it became necessary for Kaehler to devote practically all of his time thereto and to lay out large sums of money in repairing the machinery and equipping the plant for operation. The original agreement creating the trust contemplated that the trustee should be compensated for his services in caring for the property, selling it and distributing the proceeds, such being the extent of the trustee's duties and powers. Subsequently, by an express agreement his duties and powers were enlarged and additional services, different in their nature, were required of the trustee, and also the application of his own money to the execution of the trust duties, as enlarged by the later agreement, was required, and no agreement was made for additional compensation. When the agreement creating an express trust provides that the trustee shall be compensated and fixes a specific sum to be paid as such compensation, if, by an express agreement, new duties are required to be performed by the trustee different in their nature from such as were required of him under the original agreement, a court of equity may allow compensa-

tion in a reasonable amount for the performance by the trustee of the additional duties required of him by the supplemental trust agreement. (28 Am. & Eng. Ency. of Law, —2d ed.—1039.) In rendering his account Kaehler specified, in addition to the $10 per week under the original agreement, the sum of $30 per week as a reasonable compensation for the additional services required of him under the agreement to operate the plant and for advancing the necessary funds to so operate it. It appears from the testimony of Kaehler that he had $5000 invested in the brick plant in addition to the debt owing him from Mayer & Towle. The services of Kaehler required under that agreement to operate the plant were outside of and additional to the services required under the original agreement and different in their nature. The expending of his private funds was also additional thereto and different in character. While Kaehler was holding the brick plant, under the original agreement, for the benefit of all the creditors of Mayer & Towle who joined in that agreement, it would be unjust and inequitable to require that he should perform the additional services and advance his private funds for the benefit of the parties to the agreements, both original and supplemental, for such a length of time as the evidence shows he did, and should receive nothing more than the compensation provided for in the original agreement, in the performance whereof the services were light and no investment of funds necessary. The total allowance made by the Appellate Court was $10 per week under the original agreement and $30 per week for his services and the use of his private funds in operating the plant under the supplemental agreement. There was uncontradicted evidence showing the management of the plant was worth $50 per week. We think, under all of the circumstances, the judgment of the Appellate Court was amply justified by the proof in the record.

*Third*—This assignment raises the question whether it was error to require an accounting of the funds received by

Kaehler from the Cook County Brick Company. In holding such accounting proper we think the decree was correct. The evidence shows that the amount paid by Kaehler for the stock in the brick company, namely, $225 for nine shares thereof, was not the real consideration therefor. The fact that Kaehler was in possession of the brick plant as trustee for the creditors of Mayer & Towle, and could control it and lease it to the new company, was the real and true reason why the organizers of the Cook County Brick Company permitted Kaehler to take stock in the brick company. The evidence shows that stock was sold by said brick company only to the owners or lessees of brick plants. Had Kaehler not been acting as trustee for the creditors of Mayer & Towle he would not have had possession of the brick plant, and had he not had possession of the brick plant no opportunity would have been offered him to take stock in the brick company. Whatever profits were made on the stock in the Cook County Brick Company were made for the creditors of Mayer & Towle, for whose use Kaehler had the possession and management of the brick plant.

*Fourth*—It was not error for the court to decree the amount to be paid by the appellant administrator of Kaehler to the appellees, in due course of administration, as a claim of the sixth class. The statute provides that "when the decedent has received money in trust for any purpose, his executor or administrator shall pay out of his estate the money thus received and not accounted for," and a claim of this character is of the sixth class. As we have seen, the indebtedness was that of a trustee for moneys received under an express trust for the use of the beneficiaries of the trust. It was therefore properly classified as a claim of the sixth class against the estate of the trustee. *Wilson* v. *Kirby,* 88 Ill. 566; *Svanoe* v. *Jurgens,* 144 id. 507.

The judgment of the Appellate Court is affirmed.

*Judgment affirmed.*